# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **ARNAUD VAN DER GRACHT DE ROMMERSWAEL, Derivatively on Behalf of RENT-A-CENTER, INC.** | § § § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | |
| | § | |
| **MARK E. SPEESE, J.V. LENTELL, JEFFERY M. JACKSON, STEVEN L. PEPPER, MICHAEL J. GADE, LEONARD H. ROBERTS, RISHI GARG, ROBERT D. DAVIS, GUY J. CONSTANT, PAULA STERN, JPMORGAN CHASE BANK, N.A, and THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.** | § § § § § § § § § § | **No. 4:17CV227** <br> **Judge Mazzant/Judge Craven** |
| **Defendants** | § | |
| | § | |
| **and** | § | |
| | § | |
| **RENT-A-CENTER, INC., a Delaware Corporation** | § § | |
| **Nominal Defendant** | § | |

## ORDER ADOPTING REPORT AND
## RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Came on for consideration the report of the United States Magistrate Judge in this action, this matter having been referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636. On August 11, 2017, the Magistrate Judge issued a Report and Recommendation, recommending Defendants Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 29) be denied, with the part of the motion seeking dismissal of Plaintiff's POS claims for failure to demonstrate demand futility being denied without prejudice. Defendants filed objections to the Report and Recommendation, and Plaintiff filed a response to the objections. The Court conducts a *de novo*

review of the Magistrate Judge's findings and conclusions.

## BACKGROUND

This is a direct and shareholder derivative action brought by Arnaud van der Gracht de Rommerswael ("Plaintiff") on behalf of nominal defendant Rent-A-Center, Inc. ("RAC" or the "Company") against Mark E. Speese, J.V. Lentell, Jeffery M. Jackson, Steven L Pepper, Michael J. Gade, Leonard H. Roberts, Rishi Garg, Robert D. Davis, Guy J. Constant, and Paula Stern ("Individual Defendants") for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and declaratory judgment. The Individual Defendants are current and former officers and directors of RAC who allegedly "presided over the Company while its stock price has been decimated and its leadership forced to resign." Docket Entry # 30 at pg. 1. Individual Defendants, together with RAC, are referred to as "RAC Defendants."

The original complaint was filed on April 3, 2017. RAC Defendants filed a motion to dismiss on April 25. Rather than respond to the motion to dismiss his original complaint, Plaintiff amended his complaint twice, once on May 9 and again on May 19 (with leave of court) to address actions taken by RAC's Board of Directors following the filing of the initial complaint. The live complaint is Plaintiff's Verified Second Amended Stockholder Direct and Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Aiding and Abetting, and Declaratory Judgment (the "SAC"). (Doc. No. 26).

The Court provides the following facts, as outlined in the Report and Recommendation. RAC is one of the largest rent-to-own operations in America. SAC, ¶ 1. RAC is managed by a board of directors (the "Board"). At the time Plaintiff filed suit, Defendants Pepper, Gade, Garg, Jackson, Lentell, Roberts, and Speese were members of the Board (the "Directors"). *Id*., ¶ 141. Defendant

Stern previously served as a member of the Board. *Id.*, ¶ 33. The Directors, along with Stern, are referred to collectively as the "Director Defendants." Defendants Davis and Constant are former executive officers of the Company, and together with the Director Defendants, are referred to as "Individual Defendants." Individual Defendants, together with RAC, are referred to as "RAC Defendants" or just "Defendants."

The SAC asserts seven causes of action, including five derivative counts and two direct counts.[1] The four derivative counts remaining include claims of breach of fiduciary duty, unjust enrichment, and waste of corporate assets against the Individual Defendants. The two direct causes of action are for declaratory judgment concerning the alleged illegal "Proxy Put" provisions and the alleged entrenching actions by the Board.

The allegations in Plaintiff's SAC relate to the following issues: (1) alleged acts for the purposes of entrenching Board members, including the Board's adoption of Proxy Put provisions in certain of the Company's financing agreements; (2) the Company's financial and management performance, particularly for the implementation of a new point-of-sale ("POS") system; (3) statements made and approved by the Individual Defendants regarding the Company's financial and management performance and the POS system; and (4) alleged corporate waste related to severance compensation paid to two former RAC executives. Specifically, the SAC alleges as follows.

---

[1] In one derivative count, Plaintiff alleged RAC's lenders—JPMorgan Chase Bank, N.A. ("JPMorgan") and The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon")—were liable for aiding and abetting the Individual Defendants' breaches of fiduciary duty in connection with the Proxy Put provisions in the Company's debt agreements. On July 10, 2017, the undersigned dismissed Plaintiff's claims against JPMorgan and BNY Mellon without prejudice.

**Proxy Put provisions in RAC's debt agreements**

In August of 2015, Engaged Capital, LLC ("Engaged Capital"), an investor group with a significant stake in RAC, began engaging with RAC in an "attempt to determine how to improve the returns of the Company for the benefit of all stockholders." *Id*., ¶ 9. On December 7, 2016, Engaged Capital sent RAC's Board a private letter, noting its concerns with the Company's governance and suggesting the Company "immediately explore all available strategic alternatives, including a potential sale of the Company." *Id*., ¶¶ 9, 107.

Following discussions with the Board, on February 23, 2017, Engaged Capital sent a formal letter to RAC setting forth its initial five nominees for director positions for election to the Board at the 2017 Annual Meeting of Stockholders ("2017 Annual Meeting"). *Id*., ¶¶ 9-10. Engaged Capital indicated it would withdraw two of the five nominees provided three of the Company's seven directors would be up for election at the 2017 Annual Meeting. *Id*., ¶ 10. According to Plaintiff, the Board obstructed these efforts, almost immediately, by challenging the validity of Engaged Capital's nominations. *Id*., ¶ 109.

Plaintiff alleges the steps Engaged Capital can take "are limited by the defensive measures put in place by the Board," particularly the "Proxy Put in place in its debt agreements." *Id*., ¶ 85. The Company's financing includes a credit agreement negotiated with JPMorgan and an indenture agreement negotiated with BNY Mellon. *Id.,* ¶ 86. According to Plaintiff, these agreements are significant because they contain provisions that are triggered under a "change of control," when a majority of the Board changes, referred to herein as the "Proxy Put" provisions. *Id.* A change of control can also occur under the Proxy Put provisions if new directors are not "continuing directors," as defined within these agreements. *Id.,* ¶ 87.

According to Plaintiff, if a change in control occurs, the Company faces serious harm. Specifically, a change in control would force the Company to purchase all of the outstanding notes at 101% of their original principal amount, plus accrued interest to the date of repurchase, and would allow JPMorgan to force the Company to pay the amount owed under the loan.[2] *Id.* RAC would not be able to pay these debts back, as it had only $95.4 million in cash and cash equivalents as of December 31, 2016. *Id.,* ¶ 90. According to Plaintiff, "this Proxy Put will hang over any election, impairing stockholders free exercise of their vote knowing that electing Engaged Capital's slate runs the risk of RAC having to immediately pay $750 million, without adequate means." *Id.*, ¶ 11.

Plaintiff alleges the Proxy Put "is a defensive measure that interferes with the stockholder voting franchise without any compelling justification, and would embed structural power-related distinctions between groups of directors not found in the certificate of incorporation." *Id.*, ¶ 92. Plaintiff alleges the Board members' agreement to the Proxy Put could only be done to entrench themselves "just in case such a situation as here arises," and the entrance into the Proxy Put was in breach of the Board's fiduciary duties. *Id.*, ¶ 11. Plaintiff further alleges the adoption of the Proxy Put is inexcusable, asserting the members of the Board "were required to know that they were breaching their fiduciary duties in agreeing to the Proxy Put." *Id.*, ¶ 93.

Despite warnings from Delaware courts starting in 2009 regarding the potentially "eviscerating" nature of the change of control penalties imposed by proxy put clauses, the senior notes were issued after these warnings, in November 2010 and March 2013, and the Board kept the Proxy Put in the credit agreement despite amendments in July 2011 and March 2014. *Id.*, ¶¶ 93-94,

---

[2] At the time the complaint was filed, Rent-A-Center had $550 million worth of senior notes outstanding and a $186.7 million outstanding loan with JPMorgan. SAC, ¶ 86.

99. According to Plaintiff, although the Proxy Put provisions create potentially catastrophic risks for the Company, there is no evidence the Board received, or negotiated for, extraordinary consideration in return. *Id*., ¶ 99. When the financing agreements were negotiated, the market was very favorable, and RAC's stock price was much higher than it is now. *Id*.

**The POS system**

In mid-2015, RAC began implementing the new POS system, which was intended to be a significant upgrade from RAC's previous system. *Id*., ¶ 2. The POS system "handle[d] a number of client-related services" and "tracked collection-related activities" which RAC's then-Chief Executive Officer ("CEO"), defendant Robert D. Davis ("Davis"), described as "critical" to RAC's business. *Id*., ¶ 3. Defendant Guy J. Constant ("Constant"), then-Chief Financial Officer ("CFO"), agreed the change to the Company's stores was significant. *Id*.

According to Plaintiff, the rollout of the new POS system was a failure plagued with problems that, at times, included complete outages which prevented RAC from taking electronic payments. *Id*., ¶¶ 4-5. The Individual Defendants "tried to downplay the drag on results as just expected hiccups from a major change in how employees operate and the activity involved in adopting the new POS system." The Individual Defendants repeatedly called the negative impact of the POS system "short-term," even though the POS system was "significantly dragging down the Company's results, including earnings per share ('EPS') by 20% in the fourth quarter of 2015." *Id*., ¶ 4. The Individual Defendants' "poor governance, including particularly their failures in implementing and overseeing the POS system, exposed the Company and certain of the Individual Defendants" to multiple securities fraud class action lawsuits. *Id.*, ¶¶ 5, 8.

6

The Company "finally revealed the truth about the POS system disaster in October 2016" when it issued a press release. *Id.*, ¶¶ 5, 72. In this press release, RAC Defendants revealed the POS implementation caused a "larger than expected negative impact on Core sales" and indicated it would take "several quarters to fully recover from the impact to the Core portfolio." *Id.*, ¶ 72. This revelation caused the Company's market capitalization to drop nearly 30% from $684 million to $487.6 million. *Id.*, ¶ 73. Since 2015, RAC's stock price has fallen from over $40 a share to under $8 at the time this action was filed, representing an 80% drop. *Id.*, ¶ 83.

Despite the Company's poor performance and the Individual Defendants' alleged breaches of fiduciary duty, when defendants Constant and Davis resigned on December 2, 2016, and January 9, 2017, they received approximately $750,000 and $1.8 million in severance, respectively. *Id.*, ¶¶ 79-81. According to Plaintiff, the Board's granting these amounts breached its duty to the Company and caused significant harm, was made in bad faith, and constitutes waste. *Id.*, ¶ 82.

**Alleged Entrenching Actions**

According to Plaintiff, RAC's Board is classified, meaning only some of its directors are up for election each term. *Id.*, ¶¶ 12, 104. "RAC's Board has been designed to resist outside challenges for a long time, and its composition reflects that fact," with five directors serving for over a decade and two having served for over twenty years. *Id.*, ¶ 103. Plaintiff further alleges the Company has a variety of policies that contribute to Board entrenchment, including the combination of Chairman/CEO roles, the prohibition of stockholders from calling special meetings, requiring an 80% supermajority vote to amend certain charter provisions, and requiring unanimous stockholder support for actions taken by written consent. *Id.*, ¶ 105. Additionally, Plaintiff alleges the Company admits its "organizational documents and debt instruments contain provisions that may prevent or

deter another group from paying a premium over the market price to Rent-A-Center's stockholders to acquire its stock." *Id.*, ¶ 104.

On March 21, 2017, the Board announced it would nominate defendants Speese, Roberts, and Jackson for the three Class II Director positions to be elected by stockholders at the Company's annual meeting of stockholders. Because the Board was only putting up three directors for election, Engaged Capital withdrew two of its nominees, putting up its own slate of three director nominees. *Id.*, ¶ 89. Plaintiff alleges the Board refused even to allow Engaged Capital's nominees to be fairly considered for election. *Id.*, ¶ 109.

Plaintiff alleges the Board challenged Engaged Capital's nominees with numerous entrenching methods (the "Entrenching Actions"), including: (1) announcing a Poison Pill rights agreement (the "Poison Pill") in the midst of Engaged Capital's challenge, effectively preventing stockholders from acquiring more than 15% of the Company's outstanding stock; (2) refusing to grant Engaged Capital a waiver to that Poison Pill, despite Engaged Capital's assurances that it had "no intention to mount a takeover bid or participate in any change of control transaction;" and (3) changing the already-set record date for shareholders to be able to vote at the 2017 Annual Meeting. *Id.*, ¶¶ 15, 111-15 & 118-20. According to Plaintiff, the Entrenching Actions have already exposed the Company to multiple lawsuits from Engaged Capital, which remain ongoing. *Id.*, ¶ 131.

Plaintiff alleges the Board has engaged in acts that serve no legitimate purpose other than to further entrench the Board members in their positions as directors. *Id.*, ¶ 128. According to Plaintiff, their actions did nothing but impede stockholders' ability to engage in a fair voting process and spawned numerous exchanges with Engaged Capital through proxy filings and press releases. *Id.* Plaintiff alleges there was no threat or other justification for the Board's engaging in the Entrenching

Actions described above; even if there was a perceived threat, the Board's actions were grossly overzealous and unnecessary. *Id.*

## REPORT AND RECOMMENDATION

RAC Defendants filed the current motion to dismiss on June 8, 2017. On August 11, 2017, the Magistrate Judge issued a sixty-nine page Report and Recommendation, recommending Defendants Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 29) be denied, with the part of the motion seeking dismissal of Plaintiff's POS claims for failure to demonstrate demand futility being denied without prejudice.

Regarding Defendants' motion to dismiss Plaintiff's breach of fiduciary duty **proxy put/change of control provision claims,** the Magistrate Judge concluded as follows.

- The continuing wrong doctrine, an equitable exception to the contemporaneous ownership rule, gives Plaintiff standing to pursue the proxy put claims.

- Even assuming the continuing wrong doctrine is not applicable in this case, Plaintiff has satisfied the contemporaneous ownership rule by alleging he owned stock since May of 2015, almost two years prior to the initiation of this lawsuit in early April 2017 and "well before the proxy contest at the core of Plaintiff's allegations." Doc. No. 43 at 20-21.

- Plaintiff's claims concerning the language in the debt agreements state a justiciable controversy.

- Accepting all well-pled allegations as true, Plaintiff has sufficiently pled a claim with respect to the Proxy Put provisions. Specifically, Plaintiff has sufficiently pled a plausible claim because he alleged the adoption of the Proxy Put provisions was improper and unjustified, even if they did not contain a so-called "dead hand" provision.

Regarding Defendants' motion to dismiss Plaintiff's breach of fiduciary duty **POS system claims**, the Magistrate Judge first considered whether there are particularized allegations in the SAC that the Individual Defendants breached their fiduciary duties of loyalty or good faith in connection

with the POS system so as to adequately allege demand futility. The Magistrate Judge stated to excuse demand pursuant to FED. R. CIV. P. 23.1, Plaintiff must raise a reasonable doubt that the Board could have exercised independent and disinterested judgment in addressing a demand, by alleging particularized facts to show a majority of the Directors face a "substantial likelihood" of personal liability for knowingly not discharging their fiduciary duties. Doc. No. 43 at 40. The Magistrate Judge noted the presence of an exculpatory clause in RAC's certificate of incorporation means the bar for establishing a substantial likelihood of personal liability is much higher; that Plaintiff must plead particularized factual allegations supporting the inference that the alleged violation "was made in bad faith, knowingly or intentionally." *Id.*

The Magistrate Judge considered Plaintiff's allegations regarding the Directors as a group and found they were insufficient under Delaware law. According to the Magistrate Judge, under Delaware law, "whether the Directors face a substantial likelihood of liability must be determined on a director-by-director basis, and thus [Plaintiff's] conflation of all the directors into a single entity is insufficient under Rule 23.1." *Id.* at 44 (quoting *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 460-61 (S.D.N.Y. 2009)). The Magistrate Judge then considered Plaintiff's allegations against defendants Jackson, Lentell, and Pepper, members of the Audit & Risk Committee during the time the improper statements identified in the SAC were made. However, according to the Magistrate Judge, neither an awareness of facts nor a conscious disregard of oversight duties can be inferred solely from a director's service on a committee. Doc. No. 43 at 45. The Magistrate Judge held Plaintiff fails to plead particularized facts showing the Audit & Risk Committee failed to oversee "financial controls" or that Jackson, Lentell, and Pepper, as members of the committee, knew these financial controls were impacted by the POS system rollout or that they failed to act or

cure the Company's inadequate disclosures. *Id*. at 46. Thus, Plaintiff has fallen short of alleging a

*Caremark* bad faith failure to act. *Id*.

The Magistrate Judge then considered the totality of Plaintiff's allegations to determine

whether they demonstrate a reasonable doubt about the Board's impartiality. *Id*. at 47. The

Magistrate Judge held as follows:

> The SAC's allegations, even considered cumulatively, regarding improper statements
> do not meet the stringent standard of factual particularity required under Rule 23.1.
> In addition to the requirements set forth above, to establish a threat of director
> liability based on a disclosure violation, Plaintiff 'must plead facts that show that the
> violation was made knowingly or in bad faith, a showing that requires allegations
> regarding what the directors knew and when.' *In re Citigroup*, 964 A.2d at 133-34.
> 'Without knowing when and how the alleged disclosure violations occurred, it is
> impossible to determine if the directors made misstatements or omissions knowingly
> or in bad faith.' *Id*. at 134. The SAC does not contain specific factual allegations
> that reasonably suggest sufficient Board involvement in the preparation of the
> disclosures to conclude at this time that the Individual Defendants face a substantial
> likelihood of personal liability. *Id*.
>
> The SAC also lacks factual allegations critical to a *Caremark* claim. *See Guttman*,
> 823 A.2d at 506-07 (finding the complaint lacked factual allegations critical to
> *Caremark* claim, such as lack of board committees, committees' failure to meet
> regularly and committees' failure to devote adequate time to work). Plaintiffs' SAC
> lacks specific factual allegations sufficient to create a substantial likelihood of
> success on its claim that a majority of the Directors consciously failed to monitor or
> oversee RAC's operations or the implementation of the POS system.
>
> * * *
>
> Like the holding in *In re Citigroup*, the factual allegations in the SAC are not
> sufficient to allow the Court to reasonably conclude a majority of the Directors face
> a substantial likelihood of liability that would prevent them from impartially
> considering a demand. *Id*. at 132. Thus, the allegations in the SAC do not
> sufficiently satisfy the Court that Plaintiff should be excused from his obligation in
> a derivative suit to make demand prior to filing suit.

Doc. No. 43 at 47-48.

Rather than recommend outright dismissal for failure to adequately plead demand futility

with regard to the POS system claims, the Magistrate Judge was of the opinion Plaintiff should be afforded one additional opportunity to amend to present particularized factual allegations to satisfy the heightened pleading requirements of Rule 23.1.

Thus, the Magistrate Judge recommended this part of RAC Defendants' motion to dismiss be denied without prejudice to refiling. The Magistrate Judge recommended that it be ordered that within twenty days from the date of entry of an Order Adopting the Report and Recommendation, if any, Plaintiff be required to file an amended complaint, pleading particularized facts on a director-by-director basis, where appropriate, creating a reasonable doubt that a majority of the Board is interested in the alleged wrongdoing, not independent, or would face a substantial likelihood of personal liability.

Turning to Defendants' motion to dismiss Plaintiff's breach of fiduciary duty **entrenchment claims**, the Magistrate Judge noted at the outset that Defendants' motion did not assert, as with the POS system and corporate waste claims, that the SAC fails to demonstrate demand futility, thus requiring dismissal. Doc. No. 43 at 52. According to the Magistrate Judge, although Defendants' reply brief contained two sentences regarding demand futility for Plaintiff's alleged entrenchment claims, Defendants' motion never addressed demand futility for these claims. Rather, the motion challenged Plaintiff's standing to bring the claims and whether Plaintiff has asserted a "plausible" claim under Rule 12(b)(6). Therefore, the Magistrate Judge declined to consider the "fleeting assertion raised for the first time in RAC Defendants' reply that Plaintiff has not alleged the particularized director-by-director facts required to plead demand futility for his entrenchment claims." *Id*.

The Magistrate Judge then found Plaintiff has standing as he has alleged a personal stake in

this dispute. The Magistrate Judge then considered whether Plaintiff's entrenchment claims fail to state a claim and concluded Plaintiff has sufficiently pleaded the alleged Entrenching Actions were taken for the primary or sole purpose of ensuring the Directors retained their positions. *Id.* at 59. According to the Magistrate Judge, Plaintiff has also pleaded a plausible claim that the alleged Entrenching Actions were taken for the primary or sole purpose of attempting to secure the incumbent directors' positions. *Id*. at 61-62.

The Magistrate Judge disagreed with Defendants' assertion that the SAC fails to plead any facts suggesting the alleged Entrenching Actions taken by the Board were "anything other than reasonably tailored to the threat posed." *Id.* at 64. Noting the difficulty in determining the line between board actions that influence the electoral process in legitimate ways and those that preclude effective stockholder action until "rather deep in [the court's] analysis," the Magistrate Judge found, for purposes of deciding Defendants' Rule 12(b)(6) motion, that Plaintiff has sufficiently alleged that none of the alleged Entrenching Actions were reasonable in relation to any "threat" posed within the appropriate legal framework. *Id*. at 62-63 (citing *Chesapeake Corp. v. Shore*, 771 A.2d 293, 320 (Del.Ch.2000)). The Magistrate Judge noted the threats identified in Chesapeake were "price inadequacy" and "the risk of stockholder confusion," neither of which is present here. Doc. No. 43 at 63.

According to Plaintiff, the only threat posed here was the possibility that up to three of Engaged Capital's directors would be elected, and this is not a case where there would be an immediate change of control; thus the Board's actions "should have been limited to attempts to inform the shareholders about the Board's view, rather than an attempts to force their hand by manipulating the voting process." *Id*. at 63-64. The Magistrate Judge concluded the allegations in

the SAC regarding the alleged Entrenching Actions are sufficient to state a claim to relief that is plausible on its face. *Id.* at 64.

Finally, the Magistrate Judge considered Plaintiff's **corporate waste claims** and found Plaintiff has adequately pleaded demand futility for the claims for corporate waste for the approval of the severance compensation to defendants Constant and Davis. *Id*. at 68. According to the Magistrate Judge, the "SAC raises a reasonable doubt that the decision to approve the severance compensation was the product of a valid exercise of business judgment." *Id.*

## OBJECTIONS

RAC Defendants filed objections to the Report and Recommendation. RAC Defendants **first** assert the Magistrate Judge misapplied the standard for pleading a waste claim, and the claim should be dismissed for failure to plead demand futility.

RAC Defendants next assert Plaintiff fails to state a claim for adopting "illegal proxy puts," and the Magistrate Judge improperly applied Delaware law governing "dead hand" proxy put provisions to commonplace change in control provisions in the Company's debt agreements. According to RAC Defendants, Plaintiff has failed to meet the Delaware Supreme Court's legal standard for challenging a change in control provision, and there are no facts that "come close to indicating that, at the time of adopting the change-in-control provision, there was a foreseeable material risk to Rent-A-Center." Doc. No. 45 at 5. RAC further assert Plaintiff lacks standing to challenge these provisions, and the claims are nonjusticiable.

RAC Defendants next assert Plaintiff's entrenchment claims should be dismissed because Plaintiff lacks standing to bring them and he fails to state a claim upon which relief may be granted.

Finally, regarding Plaintiff's POS system claims, RAC Defendants assert the Magistrate

14

Judge correctly concluded Plaintiff failed to plead demand futility. However, RAC Defendants object to the recommendation that the motion to dismiss the POS system claims be denied without prejudice to refiling after Plaintiff is given an opportunity to amend.

## *DE NOVO* REVIEW

**Plaintiff's corporate waste claims**

While "the discretion of directors in setting executive compensation is not unlimited," *In re Citigroup,* 964 A.2d 106, 138 (Del.Ch.2009), "[i]t is the essence of business judgment for a board to determine if 'a particular individual warrant [s] large amounts of money, whether in the form of current salary or severance provisions.'" Brehm v. Eisner, 746 A.2d 244, 263 (Del.2000). "To prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Kaufman v. Allemang*, 70 F. Supp. 3d 682, 696 (D. Del. 2014).

A claim of waste requires the pleading of particularized facts demonstrating "the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation paid." *Taylor v. Kissner*, 893 F. Supp. 2d 659, 673 (D. Del. 2012) (quoting *Orloff v. Shullman,* 2005 WL 3272355, at *11 (Del.Ch.2005)). Corporate waste is "confined to unconscionable cases where directors irrationally squander or give away corporate assets, such as where "the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *See Brehm,* 746 A.2d at 263; *see also White v. Panic*, 783 A.2d 543, 554 (Del.2001).

Plaintiff alleges the Board paid wasteful amounts of severance compensation to defendants Davis and Constant. The Magistrate Judge recognized, at this stage, the SAC contains "well-pleaded factual allegations regarding the claim for waste for the approval of the severance compensation 'that make it impossible for [the Court] to conclude with reasonable certainty that the plaintiff could prevail on no set of facts that could be reasonably inferred from the allegations in the [complaint]." Doc. No. 43 at 68 (citing *In re Citigroup, Inc. S'holder Derivative Litig.*, 964 A.2d 106, 138 (Del. Ch. 2009))

According to RAC Defendants, Plaintiff has not and cannot plead that the Company received no consideration at all for the severance compensation paid to Davis and Constant. RAC Defendants assert Constant agreed to post-employment covenants, including non-competition and confidentiality covenants, when he resigned as CFO, and Davis released all claims that he might have against the Company. RAC Defendants attempt to distinguish *Citigroup* relied upon by the Magistrate Judge. According to Defendants, the departing CEO in that case received severance worth more than $68 million, in addition to being provided an office, car, and services from an administrative assistant and driver. *In re Citigroup*, 964 A.2d at 138.

While Defendants argue $750,000 and $1,800,000 compensation packages to Davis and Constant do "not compare" to the $68 million severance paid to the departing CEO in *Citigroup*, Plaintiff points out "Citigroup is a company with a market capitalization of $183.72 **billion**, which is **two hundred and eighty times as large as Rent-A-Center**, at $657.21 million." Doc. No. 47 at 2 (emphasis in original). According to Plaintiff, if Davis and Constant had received compensation packages "commensurately as large–280 times as large– they would have been $210,000,000 and

$505,000,000, highlighting just how absurd their packages really were considering the size of the Company." *Id.* Plaintiff asserts the "lavish severance packages" were particularly egregious given Davis and Constant were the "top officer of Rent-A-Center" while the Company's stock "plummeted from over $35 a share to under $8 a share," "presided over the disastrous POS system rollout," and in general, "oversaw performance so poor that it exposed the Company to federal securities class actions and a proxy contest from Engaged Capital." *Id*. at 3 (citing Doc. No. 43 at 65)(citing SAC, ¶¶ 7-9, 73, 83).

A corporate waste claim fails "if there is any substantial consideration received by the corporation, and...there is a good faith judgment" that under the circumstances the transaction was worthwhile. *White*, 783 A.2d at 583. Although Defendants assert Davis and Constant relinquished significant rights in exchange for the severance compensation, similar to the situation in *Citigroup*, there is little information regarding the real value of the rights allegedly relinquished. 964 A.2d at 138. The court in *Citigroup* made clear that a plaintiff may state a claim for waste related to the payment of outsized executive compensation when "a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." *Id.* (internal quotation marks and citation omitted).

Even though the issue is a close one, without more information, and taking Plaintiff's allegations as true, the Court agrees with the Magistrate Judge that Plaintiff has adequately pleaded demand futility for the claim of corporate waste for the approval of the severance compensation to Davis and Constant. There is a reason to believe, based on the pleadings, that waste may have occurred. Stated differently, there is reasonable doubt the challenged compensation was a valid

exercise of business judgment.  Thus, this issue is best decided on summary judgment record rather than at the Rule 12(b)(6) stage.  This objection is overruled.

**Plaintiff's proxy put/change in control provision claims**

According to Defendants, the Magistrate Judge relied on case law dealing with "dead hand" proxy put provisions instead of commonplace change in control provisions like the ones at issue in this case.  The Magistrate Judge noted Delaware law has recognized the potentially harmful effects of proxy put provisions even in cases with "commonplace" provisions.  *See San Antonio Fire & Pension Fund v. Amylin Pharmaceuticals, Inc.*, 983 A.2d 304 (Del.Ch. 2009) ("*Amylin I*"), *aff'd en banc*, 981 A.2d 1173 (Del.2009) ("*Amylin II*").

There, the Delaware Court of Chancery addressed whether a "commonplace provision found in a trust indenture governing publicly traded notes" prevented the issuer's board of directors from "approving" as "continuing directors" persons nominated by stockholders in opposition to the slate nominated by the incumbent directors.  *Id*. at 306.  The court recognized proxy puts "can operate as improper entrenchment devices that coerce stockholders into voting only for persons approved by the incumbent board to serve as continuing directors," but held the provision at issue was "properly understood to permit the incumbent directors to approve as a continuing director any person, whether nominated by the board or a stockholder, as long as the directors take such action in conformity with the implied covenant of good faith and fair dealing and in accordance with their normal fiduciary duties." *Id.* at 307.

The court did not read the indenture provision as narrowly as urged by the indenture trustee because read that way, "the Indenture would prohibit *any* change in the majority of the board as a result of any number of contested elections, for the entire life of the notes."  *Id*. at 315 (emphasis in

18

original).  According to the court, such a provision in an indenture "with such an eviscerating effect on the stockholder franchise would raise grave concerns."  According to the court,

> In the first instance, those concerns would relate to the exercise of the board's fiduciary duties in agreeing to such a provision. The court would want, at a minimum, to see evidence that the board believed in good faith that, in accepting such a provision, it was obtaining in return extraordinarily valuable economic benefits for the corporation that would not otherwise be available to it. Additionally, the court would have to closely consider the degree to which such a provision might be unenforceable as against public policy.

*Id.*

RAC Defendants point out there were two agreements at issue in *Amylin* – the indenture with what RAC Defendants call commonplace change of control provisions and a credit agreement containing a "dead hand proxy put."  The credit agreement disallowed incumbent directors from avoiding acceleration of the debt by "explicitly confining" their ability to approve "any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies. . . ."  *Id*. at 309. The indenture, however, did not prevent incumbent directors from "approving" dissident director candidates.  Thus, RAC Defendants argue Delaware law distinguishes between a true "dead hand proxy put" and a change of control provision in a company's original agreements, the latter of which are not improper.  RAC Defendants assert Plaintiff ignores this distinction.

In response, Plaintiff asserted RAC Defendants' reliance on *Amylin I*'s ultimate outcome as to the indenture provision was misplaced because it was not a decision involving a motion to dismiss, like in this case.  The Magistrate Judge agreed with Plaintiff that the stage of the case makes a difference, noting the *Amylin I* court considered evidence and its conclusions regarding whether the directors breached their duty of care was decided after a "trial was held and oral arguments were

heard on all outstanding motions for summary judgment regarding the Indenture." Doc. No. 43 at 26 (quoting *Amylin I* at 312).

According to Defendants, the Delaware Supreme Court's affirmance of the decision in *Amylin I* makes clear that a challenge to change in control provisions survives only when there are facts showing "that approving the 'proxy put' at [the time of its adoption] would involve [a] reasonably foreseeable material risk to the corporation or its stockholders." *Amylin II*, 2009 WL 3182602, *1 n.2. Defendants assert there are no facts here that come close to indicating that, at the time of adopting the change in control provision, there was foreseeable material risk to RAC.

The Court disagrees. The SAC contains a subsection titled "The Adoption of the Proxy Put is Inexcusable," setting forth reasons why it was allegedly a breach of the Directors' fiduciary duties to adopt the agreement. SAC, ¶¶ 93-101. Plaintiff alleges there was no indication the Board received or even negotiated for any extraordinary consideration in exchange for this agreement. *Id.,* ¶ 99. Plaintiff further alleges there was ample warning of the improper nature of such agreements, noting that "[t]he Company issued the senior Notes in November 2010 and Mar[ch] 2013, one year and four years after the *Amylin* decision" and that "[t]he Board kept the Proxy Put [provisions] in [] the credit agreement despite amending it in July 2011, two years after *Amylin*, and March 2014, five years after *Amylin*." *Id.*

Moreover, Plaintiff alleges there was no need to agree to the Proxy Put provisions because "the market for debt during those times was very favorable and [Rent-A-Center]'s stock price was considerably higher than it is now." *Id.* According to Plaintiff, the Company even said that it expected improved treatment in terms of interest rates in July 2011, with defendant Davis stating in a press release that "we expect an approximate 100 basis point improvement in interest rates on the

new credit facility as compared to the prior facility." *Id.* Similarly, at the time of the March 2014 amendment, the Company again touted its ability to access credit, stating "the Company expects to access a larger pool of capital while lowering the average cost of indebtedness to the Company." *Id.*

Plaintiff argues the adoption and approval of the Proxy Put provisions constitute a breach of the fiduciary duty of loyalty because those involved knowingly weakened the Company in exchange for provisions that do nothing but help ensure the safety of their own Board seats. According to Plaintiff, one way in which the Proxy Put provisions have "an eviscerating effect on the stockholder franchise" that "deter the stockholders from nominating and electing directors of their choosing" is by discouraging changes of control. Docket Entry # 30 at pg. 10. Among other things, Plaintiff alleges the Proxy Put provisions in the debt agreements "disenfranchise[] stockholders by forcing them to vote for incumbent directors or their designees" to avoid "the threat of financial catastrophe." SAC, ¶ 92. Plaintiff contends the Proxy Put provisions already had a deterrent effect that required litigation to remove.

Although this issue is also a close one, Defendants cite no authority providing a proxy put provision without a "dead hand" feature cannot establish a breach of fiduciary duty. The Court again finds the Proxy Put claims should be addressed at the summary judgment stage. As held by the Magistrate Judge, Plaintiff has sufficiently pleaded a plausible claim that the adoption of the Proxy Put provisions was improper and unjustified, even if they did not contain a so-called "dead hand" provision, so as to survive a motion to dismiss.

The Court also finds Plaintiff has standing to challenge the provisions. According to Defendants' objections, Plaintiff acquired his shares in the Company in May of 2015, years after the Company agreed to the challenged provisions, and Plaintiff cannot rely on the "continuing wrong"

doctrine to establish standing. Defendants assert the Magistrate Judge misapplied the continuing wrong doctrine. Defendants assert, unlike the plaintiff in *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 131 (5th Cir.1969), relied upon by the Magistrate Judge, "Plaintiff in this case was at the time he purchased his shares 'a stranger to the corporation who [bought] stock with knowledge of the alleged wrongs.'" Doc. No. 45 at 12. According to Defendants, the *Bateson* plaintiff had been a continuous shareholder in that company for over a decade and "had long since planned" to file a derivative action. *Id.* at 129.

The Fifth Circuit in *Bateson* stated "the requirement that a shareholder must have owned stock at the time of the wrong of which he complains may be satisfied if the wrong is a continuous one; that is, if it spans the plaintiff's ownership, or if new elements in a pattern of wrongful conduct occur after acquisition." *Id.* at 130 (internal quotation and citation omitted). Here, Plaintiff alleges a continuing wrong "based on the alleged pattern of wrongful conduct after his purchase, including the Individual Defendants' recent re-negotiations of the debt instruments that are key parts of the alleged wrongdoing." Doc. No. 47 at 4. The Court is unable to determine as a matter of law at this time that this claim fails to assert illegal conduct by the Individual Defendants "subsequent to the acquisition of the stock by [P]laintiff and at a time when he had a right to complain thereabout." *Id*. (quoting *Palmer v. Morris*, 316 F.2d 649, 650 (5th Cir. 1963)).

There is no equitable reason at this stage of the case to deny Plaintiff standing. However, Defendants may move for summary judgment on the issue of standing and specifically whether the alleged wrongs have completely occurred and were terminated prior to Plaintiff's acquisition of stock and whether the stock was acquired with such knowledge. *Bateson*, 414 F.2d at 130.

Finally, Defendants assert Plaintiff's Proxy Put claims are not ripe for review because

Plaintiff's claims are only "abstract or hypothetical." Doc. No. 45 at 9 (quoting *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir.2010). According to Defendants, it is undisputed the Company's shareholders elected all three directors nominated by Engaged Capital earlier this summer after a proxy contest; and because the Board approved those three directors, their election did not trigger the change in control provisions. Defendants argue no live case or controversy remains regarding Engaged Capital's nominees.

Plaintiff argues the claims are ripe "because they relate to a present and ongoing impact on shareholder rights – the deterrent effect of the Proxy Put provisions." Doc. No. 43 at 21 (quoting Doc. No. 30 at 16). The Magistrate Judge found Defendants' "ripeness" argument without merit, relying on *Moran v. Household Int'l, Inc.*, 490 A.2d 1059 (Del. Ch.1985). There, the defendant argued the plaintiff's challenge to a poison pill provision was premature and presented the court with no justiciable controversy. *Id*. at 1072. The court rejected the argument, stating the plaintiffs were "contesting the Plan's present effect on their entitlement to receive and consider takeover proposals and to engage in a proxy fight for control of [the company]" and also contesting the validity of the rights under the Delaware General Corporation Law. *Id.* According to the court, to this extent, "the plaintiffs' suit involves the alleged present depressing effect of the Rights Plan on shareholder interests, regardless of whether the rights are in fact ever triggered." *Id*.

In their objections, Defendants rely on *In re Allergan, Inc. Stockholder Litigation*, 2014 WL 5791350 (Del.Ch. Nov. 7, 2014), wherein the court refused to follow *Moran*, on which the Report and Recommendation relied. Doc. No. 43 at 21-22. In *Allergan*, the court ruled the case was not ripe because "the fact remain[ed] that [shareholders] have not been deterred from seeking control of the board through a proxy contest." *Id.* However, the court in *Allergan* specifically acknowledged

"several decisions in which [the Delaware Chancery Court had] found ripe for review challenges to the implementation of stockholder rights plans and proxy put provisions" and that in "each of these cases, the key consideration to the [c]ourt's finding of a ripe controversy was the present effect the provisions in question were deemed to have on stockholders because of their deterrent features." 2014 WL 5791350, *8. Importantly, the court in Allergan considered the issue of ripeness after a motion for summary judgment, oral argument, and supplemental briefing on the issue of ripeness. *Id.* at *6.

The Court is not convinced this claim should be dismissed at this time for lack of ripeness. However, Defendants may move for summary judgment on the issue of whether the Proxy Put/change in control provisions can be legitimately characterized as a significant deterrent to the ability of RAC's shareholders to exercise their rights. Defendants' objections regarding Plaintiff's breach of fiduciary duty Proxy Put claims are overruled.

**Plaintiff's entrenchment claims**

The Magistrate Judge rejected Defendants' arguments that Plaintiff lacks standing to pursue claims based on the alleged Entrenching Actions taken by the Individual Defendants and that Plaintiff has failed to state a claim with respect to the alleged Entrenching Actions. Defendants' first objection attempts to raise the demand futility argument the Magistrate Judge correctly concluded had been waived when Defendants failed to address the issue in their motion. However, the Court will allow Defendants to raise the issue of demand futility in any future summary judgment motion, if warranted.

Defendants' second objection is that Plaintiff has only alleged one injury, and it is an injury to the Company and not to himself. Relying on *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

24

*(TOC), Inc.*, 528 U.S. 167, 180 (2000), Defendants assert Plaintiff, even suing derivatively, can only allege injuries that are "fairly traceable" to the Company' Delaware litigation with Engaged Capital.

According to Plaintiff, he has alleged (1) a "'unique harm to himself [through] the interference with his right to vote, as opposed to the damages caused to the Company by the Entrenching Actions of the Board' (harm to him directly)" and (2) "injury in many ways, including concrete injury to the Company he seeks to recover for through his derivative claims in that the Entrenching Actions caused Engaged Capital to bring legal actions against the Company twice, 'exposing the Company to even greater damages with no upside to the Company.'" Doc. No. 47 at 6 (quoting Doc. No. 43 at 53-54)). Plaintiff further asserts he has met the "fairly traceable" injury requirement based on his allegations that because of the alleged Entrenching Actions "the Company had to expend money to engage in a proxy battle with Engaged Capital and to defend litigation brought by them." Doc. No. 47 at 8 (citing SAC, ¶¶ 106-25, 131).

The Court is not convinced at this time that Plaintiff lacks standing to bring the entrenchment claims. The Court also finds, contrary to Defendants' objections, that Plaintiff has sufficiently pleaded the alleged Entrenching Actions were taken for the primary or sole purpose of ensuring the directors retained their positions. The Court does not find the Magistrate Judge misapplied *Unocal Corp. v. Mesa Petrol. Co.*, 493 A.2d 946, 955 (Del. 1985). The Magistrate Judge set forth four pages of applicable law, including general law in Delaware that the business judgment rule, including the standards by which director conduct is judged, is applicable in the context of a takeover. See Doc. No. 43 at 55-59. According to the Magistrate Judge, in *Unocal*, the court held "there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Unocal*, 493 A.2d at 954. As noted by the Magistrate Judge, "[a]

25

corporation does not have unbridled discretion to defeat any perceived threat by any Draconian means available." *Id.* at 955. For example, directors may not employ defensive measures "solely or primarily out of a desire to perpetuate themselves in office." *Id.* Instead, directors must have "reasonable grounds for believing that a danger to corporate policy and effectiveness existed." *Id.* Moreover, any defensive measure employed "must be reasonable in relation to the threat posed." *Id*.

Even though Defendants argued it did not apply, the Magistrate Judge also outlined the standard relied upon by Plaintiff (the *Blasius* standard). According to the Delaware Chancery Court in *Blasius*, when defensive actions have been taken for the sole or primary reason for perpetuating directors' position in office, the business judgment rule does not apply, and the board must carry "the heavy burden of demonstrating a compelling justification for such action." *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 661 (Del. Ch. 1988).

The Magistrate Judge carefully considered both sides' arguments and noted "it is not easy in most cases to determine whether the *Blasius* standard relied should be invoked." Doc. No. 43 at 62 (quoting *Chesapeake Corp. v. Shore*, 771 A.2d 293, 320 (Del.Ch.2000). In *Chesapeake*, the court noted that in typical cases involving board actions touching upon the electoral process, "the question of whether the board's actions are preclusive is usually hotly contested," and the line between board actions that influence the electoral process in legitimate ways and those that preclude effective stockholder action "is not always luminous." *Id*. The court stated in such a case, "the court must be rather deep in its analysis before it can even determine if the *Blasius* standard properly applies." *Id.* The Magistrate Judge also noted that the opinion in Chesapeake was issued post-trial. Doc. No. 43 at 63.

The Magistrate Judge then found, for purposes of deciding Defendants' Rule 12(b)(6)

motion, that Plaintiff has sufficiently alleged that none of the Entrenching Actions were reasonable in relation to any "threat" posed with the Unocal framework. *Id.* In their objections, Defendants assert the Magistrate Judge underestimated the threat posed to the Company by Engaged Capital's actions. The extent of the threat may be considered at a later date and with benefit of a developed record.

Considering it is oftentimes not easy to determine whether the *Blasius* standard should be invoked and further considering the extent of the analysis required to make such a determination, the Court agrees with the Magistrate Judge that Defendants' Rule 12(b)(6) motion to dismiss these claims should be denied. The allegations regarding the alleged Entrenching Actions in the SAC are sufficient to state a claim to relief that is plausible on its face. Defendants' objections regarding the entrenchment claims are overruled.

**Plaintiff's POS system claims**

Finally, Defendants argue the Court should dismiss Plaintiff's POS claims with prejudice based on Plaintiff's failure to satisfy Rule 23.1's demand requirement. The Magistrate Judge correctly noted that FED. R. CIV. P. 15(a)(2) provides that a court should freely give leave to amend with "justice so requires." Plaintiff has not had the opportunity to amend his allegations in response to a specific court order. The July 20, 2017 Scheduling Order also provides a November 22, 2017 deadline for Plaintiff to file amended pleadings. Defendants may re-raise the issue of lack of demand futility at a later date. For these reasons, the Court overrules Defendants' objection to the recommendation that their motion to dismiss Plaintiff's POS system claims be denied without prejudice to refiling.

## CONCLUSION

The Court has carefully reviewed the relevant briefing, the Report and Recommendation, the objections, and the response to the objections and is of the opinion the findings and conclusions of the Magistrate Judge are correct. The Court adopts the Magistrate Judge's report as the findings and conclusions of the Court. It is therefore

**ORDERED** that Rent-A-Center Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 29) is **DENIED**. RAC Defendants' motion to dismiss Plaintiff's POS system claims for failure to adequately plead demand futility is **DENIED WITHOUT PREJUDICE TO REFILING.**

Within twenty days from the date of entry of this Order, Plaintiff shall file an amended complaint, pleading particularized facts on a director-by-director basis, where appropriate, creating a reasonable doubt that a majority of the Board is interested in the alleged wrongdoing, not independent, or would face a substantial likelihood of personal liability. To plead substantial likelihood of liability for director oversight claims, Plaintiff must allege particularized facts showing the Directors had actual knowledge they were not discharging their fiduciary duties. Finally, considering RAC's certificate of incorporation contains an exculpatory provision, Plaintiff shall include in his amended complaint particularized allegations of facts which would allow the Court to conclude there is a substantial likelihood the challenged conduct falls outside the exemption.

**SIGNED this 12th day of October, 2017.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

28